The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.



**Dated: December 15 2020**

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 19-33609 |
| | ) | |
| Tyler J. Linton and | ) | Chapter 7 |
| Amanda M. Linton | ) | |
| | ) | |
| Debtor(s). | ) | Hon. Mary Ann Whipple |
| | ) | |

**MEMORANDUM OF DECISION AND ORDER REGARDING MOTION TO DISMISS**

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. §§ 707(b)(1) and (b)(3) [Doc. # 17] and Debtors' response [Doc. # 20]. The court held a hearing on the motion that Debtors, their counsel and the United States Trustee attended virtually[1] and at which the parties presented testimony and other evidence in support of their respective positions.

The district court has jurisdiction over this Chapter 7 case pursuant to 28 U.S.C. § 1334(a) as a case under Title 11. It has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 2012-7 of the United States District Court for the Northern District of Ohio. Proceedings to determine a motion to dismiss under § 707(b) are core proceedings that this court may hear and decide. 28 U.S.C. § 157(b)(1), (b)(2)(J) and (O).

---

[1] Due to the COVID-19 public health emergency, and the status of the pandemic in Lucas County and the State of Ohio, the court issued a Supplemental Procedures Order directing the procedures for a virtual evidentiary hearing. [Doc. # 29].

Having considered the evidence presented, the arguments of counsel, and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtors' Chapter 7 case unless they timely convert it to a case under Chapter 13.

**FACTS**

Debtors are married and have two dependent children, a son age 12 and a daughter age 16. Tyler Linton is thirty-eight years old. He is employed by Materion as an electrician and has worked there for the past six years. Materion is a beryllium production facility. Prior to 2019, Mr. Linton received regular overtime and occasional bonuses. During the latter part of June 2020, Mr. Linton was laid off for two weeks.

Amanda Linton is also thirty-eight years old. She is self-employed, having operated a dog grooming business for the past six years. Her business was affected by the public health emergency caused by COVID-19 and she was forced to close it for a time.

On November 7, 2019, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts were primarily consumer debts. [UST Ex. 2]. Debtors' Schedule D shows total secured debts in the amount of $392,535.40. These debts include $289,644.00 secured by a first mortgage on their home located in Gibsonburg, Ohio, as well as $73,185.00 secured by a first mortgage on property located in Rocky Ridge Ohio ("Rocky Ridge property"). Additional secured debts include $3,862.70 on a 2014 Chrysler Town and Country, $1,844.70 on a 2018 Ford F-150, and $23,989.00 on a 2018 Chrysler Pacifica. The debt on the 2018 Pacifica has been reaffirmed. [Doc. # 16]. Debtors' bankruptcy schedules also show unsecured nonpriority debts in the amount of $39,595.82.

The Rocky Ridge property is Debtors' former residence. They purchased that property in 2016 directly from National Bank of Oak Harbor. The Rocky Ridge property was in foreclosure and National Bank of Oak Harbor gave Debtors a purchase money mortgage loan, without an appraisal, for $86,000.00. National Bank of Oak Harbor was taken over by Croghan Colonial Bank. Debtors' monthly mortgage payment for the Rocky Ridge property is approximately $485.00. But Debtors moved out of the house due to the area and the poor condition of the property. They stopped making the mortgage payments on it because they could no longer afford to make two mortgage payments after they moved into their new home in Gibsonburg. In July 2019, Croghan Colonial Bank sued Debtors on the promissory note and obtained a default money judgment less than two months later. Debtors' Exhibit C shows that Croghan Colonial Bank commenced proceedings in aid of execution against Tyler Linton, and it appears that it has a judgment lien on their home in Gibsonburg, [Dors Ex. D].

Tellingly, the bank did not seek to foreclose its mortgage on the Rocky Ridge property. The Lintons' testimony credibly showed that they are stuck in financial no-man's land with an un-livable, currently un-rentable house (at least without expensive repairs and remodeling) that the bank unloaded on them once and apparently does not want to get stuck with again. Further, it will not work with them on the property to get it sold.

Debtors' Schedule I shows a combined gross monthly income in the amount of $6,841.47. [UST Ex. 2, pp. (2-32)-(2-33)]. Mr. Linton's monthly gross income is listed as $5,827.47. Payroll deductions include voluntary contributions to Mr. Linton's 401(k) plan, which are dependent on his amount of wages received. Mrs. Linton's monthly gross income is listed as $1,014.00. Debtors' net monthly wages after payroll deductions reflect a combined total amount of $5,855.64. Debtors' Schedule J shows total monthly expenses in the amount of $6,398.00. [UST Ex. 2, pp (2-34)-(2-35)]. This amount includes a monthly mortgage payment on their new home of $2,074.00 and monthly payments on three vehicles in the combined amount of $1,062.00. According to Debtors' Schedules I and J, at filing they had a monthly spending deficit of $542.36.

Following the meeting of creditors, the Chapter 7 Trustee on June 15, 2020, filed a "no asset" report indicating there is no property available for distribution from the estate to unsecured creditors.

Debtors' Official Form 122A-1, at part 2, determines whether the means test applies. It shows that their annualized current monthly income at the time of filing this case was $76,716.00. The median income in Ohio for a family the size of Debtors' family is $91,580.00. As there was no statutory presumption of abuse arising under § 707(b)(2), the UST timely filed a motion to dismiss for abuse under § 707(b)(1) and (3).

## LAW AND ANALYSIS

Where debts are primarily consumer debts, as in this case, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Under § 707(b)(3), in determining whether granting relief would be an abuse, the court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). This provision was adopted by Congress in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could

3

be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3). Although pre-BAPCPA case law applying these concepts remains helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007). As the movant, the UST carries the overall burden of demonstrating, by a preponderance of the evidence, that Debtors' case should be dismissed. *In re Weixel*, 494 B.R. 895, 901 (B.A.P. 6th Cir. 2013).

At the evidentiary hearing, the UST confirmed he was not seeking dismissal of Debtors' Chapter 7 petition as being filed in bad faith and argued only that the totality of Debtors' financial circumstances demonstrates they are not needy and that granting them a discharge would be therefore be an abuse of the provisions of Chapter 7. Evaluation of the totality of the circumstances allows the court to consider both prepetition and post-petition circumstances of Debtors. *See U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448, 455 (5th Cir. 2006) ("Section 707(b) does not condition dismissal on the *filing* of bankruptcy being [an abuse] but rather on the *granting of relief*, which suggests that in determining whether to dismiss under § 707(b), a court may act on the basis of any development occurring *before* the discharge is granted."); *In re Mestemaker*, 359 B.R. at 855-56; *In re Haar*, 373 B.R.493, 502-03 (Bankr. N.D. Ohio 2007).

Debtors are "needy" when "[their] financial predicament warrants the discharge of [their] debts" in a Chapter 7 case. *Behlke v. Eisen (In re Behlke)*, 358 F.3d 429, 434 (6th Cir. 2004). Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient to warrant dismissal under some circumstances. *Krohn* 886 F.2d at 126; *In re Meehean*, 611 B.R. 574, 580 (Bankr. E.D. Mich. 2020), *aff'd*, 619 B.R. 371 (E.D. Mich. Aug. 18, 2020). Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *In re Bender*, 373 B.R. 25, 30 (Bankr. E.D. Mich. 2007); *In re Burge*, 377 B.R. 573, 577 (Bankr. N.D. Ohio 2007); *see Krohn*, 886 F.2d at 126.

Debtors' counsel argues that a debtor's ability to pay debts out of future earnings cannot be the only factor supporting dismissal under a totality of circumstances analysis. This judge, as did other bankruptcy judges in this district, long ago decided that BAPCA's enactment of the means test as an artificial construct to determining whether there is a presumption of abuse under § 707(b)(2) did not preclude

consideration of a debtor's actual ability to pay under the totality analysis of § 707(b)(3)(B). *In re Mestemaker*, 359 B.R. at 853; *In re Haar*, 373 B.R. at 498 (Judge Richard L. Speer); *In re Augenstein*, Case No. 06-13867, 2007WL 6374910 at *4 (Bankr. N.D. Ohio 2007) (Judge Pat E. Morgenstern-Clarren); *In re Barnett*, Case No. 06-62414, 2007 WL 4510277 at *3-4 (Bankr. N.D. Ohio 2007)(Judge Russ Kendig). And the court disagrees with counsel's assertion that ability to pay alone can never be determinative under a totality of circumstances standard. The Sixth Circuit in *Krohn* stated that "ability to pay" "alone may be sufficient to warrant dismissal" for substantial abuse, the example being given where a debtor's "disposable income permits liquidation of his consumer debts with relative ease." *Krohn*, 886 Fed. 2d at 126. Nevertheless, the court agrees with Debtors' counsel that this is not such a case, and that it is appropriate to examine a broader range of factors than just their ability to pay to determine whether the totality of Debtors' financial circumstances shows them to be needy.

**A.      Ability to Pay**

As a component of a debtor's ability to pay, courts generally evaluate whether there would be sufficient future income in excess of reasonably necessary expenses to fund a Chapter 13 Plan. *Mestemaker*, 359 F.3d at 845 (citing *Behlke*, 358 F.3d at 435). The UST argues Debtors have an ability to fund a Chapter 13 plan and to pay a significant portion of their unsecured debt, with the evidence showing an increase in post-petition income and a decrease in post-petition expenses.

According to the UST, one source of funds available to them is the actual and increased income of Mr. Linton. The UST's Bankruptcy Auditor Catherine Lohman persuasively testified that Mr. Linton's monthly income on their Schedules I and J is understated compared to his what his pay advices show, which was $8,145, gross, as of October 11, 2019, compared to $5,827.47 as shown on Debtors' Schedule I. [UST Ex. 3,4]. Lowman calculated that as of the end of June 2020, his gross monthly income increased to approximately $8,820. Mr. Linton agreed he was earning more in 2020 due to a raise and bonuses. He estimated the raise to be .50 cents to a $1.00 an hour.

Mr. Linton also testified the mortgage payment on their Gibsonburg home had decreased from $2,074 per month, at the time their petition was filed, to approximately $1,741.00. This is corroborated by Debtors' bank statements beginning in April 2020, which show the amount of the mortgage payment withdrawn by the creditor to be $1,740.00, a decrease of $333.00 per month. [UST Ex. 5].

Debtors' monthly payments on three vehicles have also been reduced. At the time their petition was filed, they were making a $393 payment on a 2018 Chrysler Pacifica, a $435 payment on a 2014 Chrysler Town & Country, and a $234 payment on a 2008 Ford F-150 truck. Mr. Linton testified the Ford F-150

truck was paid in full.  He also confirmed there were 3 or 4 more payments left on the Chrysler Town & Country.

At present, it appears Debtors have an additional $567 a month in disposable income due just to the decrease in their Gibsonburg home monthly mortgage payment and completing payments on the Ford F-150 truck.  That overcomes the monthly budget deficit shown on their Schedules I and J at filing. Moreover, before the end of 2020, Debtors will have finished paying off the Chrysler Town & Country, giving them an additional $435, raising the amount of dollars available from reduction in monthly installment payments on secured debt to $1,002 per month. Even apart from the higher income demonstrated by Lowman, Debtors will have a material monthly budget surplus with which to pay creditors.

On the income side, Mr. Linton's gross monthly income through the end of June 2020 was approximately $8,820. When combined with Mrs. Linton's monthly income of $1,014, which is rebounding after the pandemic-related closure of her business, their combined gross income totals $9,834 per month, an increase of just over $3,000 per month from the income listed on Schedule I.

Nothing in § 707(b)(3) indicates that "'Congress intended the Court to distinguish between debtors who have always had disposable income available and debtors who have become able to pay their debts due to an increase in income or a decrease in expenses…'" *In re Goble*, 401 B.R. 262, 277 (Bankr. S.D. Ohio 2009) (quoting *In re Walker,* 383 B.R. 830, 836 (Bankr. N.D. Ga. 2008)).

Debtors' increased income in 2020 coupled with a decrease in other expenses for secured debt demonstrates  an ability to repay their debts out of future earnings.  This factor supports dismissal.

**B.  Other *Krohn* Factors**

    Stability of Future Income

In this case, Debtors are both steadily employed (self-employed in Mrs. Linton's case) and have generally maintained that employment status for the past six years. The record shows that they both experienced post-petition impacts on their income from the COVID-19 pandemic. Mr. Linton lost some overtime and was laid off for two weeks.  Mrs. Linton had to close her dog-grooming business altogether for a while. But she has resumed operations and his overtime disruption has not had a permanent material impact on his post-petition monthly income. Despite these temporary disruptions, the court finds that their sources of future income are stable. This factor supports dismissal.

    Eligibility for Adjustment of Debts Under Chapter 13

There is no dispute that Debtors are eligible for adjustment of their debts through Chapter 13 of the Bankruptcy Code, which allows debtors to repay creditors through a confirmed plan administered by a

standing trustee. They have regular income and their debts are under the statutory limits of both secured and unsecured debts that are the eligibility standards for proceeding under Chapter 13. *See* 11 U.S.C.§ 109(e). Indeed, Mr. Linton laudably testified he was willing to pay all of his unsecured creditors. The court infers that Mr. Linton was not including Croghan Colonial Bank's judgment debt against them in that statement. Debtors' counsel argued in favor of just such an "equitable" Chapter 7 solution--not discharging their other unsecured debts but discharging their personal liability to Croghan Colonial Bank. Counsel advances this solution as avoiding a perceived "windfall" rewarding Croghan Colonial Bank for driving Debtors into bankruptcy at the expense of their other creditors as he perceives to be likely under a Chapter 13 plan. But the court cannot pick and choose what debts get discharged and what debts do not get discharged under Chapter 7.[2] That is up to the parties through reaffirmation agreements and dischargeability actions.

This factor also supports dismissal, or should Debtors choose to do so voluntarily, conversion to Chapter 13.

### Availability of State Law Remedies

No evidence or argument about this factor was presented at the hearing. The court finds that it is neutral and does not inform the outcome of the motion one way or another.

### Degree of Relief Available Through Private Negotiations

This factor is the one that weighs in Debtors' favor.

Mr. Linton expressed in some measure understandable dissatisfaction and frustration with Croghan Colonial Bank. He feels that he and his wife were taken advantage of in its predecessor bank's sale of the Rocky Ridge property to them. Then, adding insult to injury, Croghan Colonial Bank would not work with them when they had a potential buyer for the property and when they became unable to make that mortgage payment anymore. The money judgment against Debtors presents as the motivating factor for this bankruptcy filing; Mr. Linton is vulnerable to garnishment of his wages, while Croghan Colonial Bank wants nothing to do with the problem property its predecessor unloaded on Debtors, and will not work with them.

Croghan Colonial Bank not having sought a determination of the dischargeability of the debt the Lintons owe it, their personal liability for the debt and the ensuing money judgment would be discharged

---

[2] While the court agrees with Debtors' counsel that the determination whether to dismiss a case for abuse is equitable, *In re Weixel*, 494 B.R. at 897; *see Behlke,* 358 F.3d at 433-34, equity cannot be stretched as far as Debtors' counsel argues it should be. *See Law v. Siegel*, 571 U.S. 415, 421(2014) (addressing the limits of equity in bankruptcy).

7

should they get Chapter 7 discharges. It was plainly content to allow the Chapter 7 process to play out and see where the discharge chips fell. And while that result would not free Debtors of the Rocky Ridge property itself and the attendant problems and potential costs that still come with it, the weight of a wage garnishment Debtors cannot afford would be lifted from their financial future in a fresh start under Chapter 7. The court acknowledges that a Chapter 7 discharge of that personal liability could also help them address the property itself through a subsequent Chapter 13 (or "Chapter 20" as it is referred to).

Given Croghan Colonial Bank's posture thus far as shown by the hearing evidence, the court finds that there is no relief that Debtors can realistically achieve through private negotiations because it has a collectible money judgment debtor in Mr. Linton. This factor supports denial of the motion.

<u>Overall Assessment of the Neediness of Debtors</u>

Despite the undeniable anchor of the Rocky Ridge property and the Croghan Colonial Bank money judgment, including the related judgment lien, around their financial necks, the record shows that Debtors otherwise live and have built for themselves and their family a comfortable existence through hard work. Both are 38 years old. They had built and are paying for a new home at a cost of $292,000. The UST's exhibits show they have money to pay for adequate food, clothing, entertainment, the needs of their children, medical and dental care and transportation, with three motor vehicles. Mr. Linton makes regular voluntary contributions to a 401(k) retirement plan, even if they are not understated on their Schedule I as Lowman contends.[3] They support their two teenage kids in sports and school activities.

---

[3] Mr. Linton's voluntary contributions to a 401(k) plan occupied what the court now views as an outsize role at the evidentiary hearing. This court has previously decided that it must consider a debtor's individual situation in deciding the role voluntary retirement plan contributions play an addressing a motion to dismiss a Chapter 7 case for abuse based on the totality of circumstances. Factors such as age, health and existing retirement resources come into play. *In re Tucker*, 389 B.R. 535, 540-41 (Bankr. N.D. Ohio 2008). In this case, given Debtors' ages, long working lives ahead and current retirement resources ($39,000 in the Materion 401(k) plan [UST Ex. 2, p. 14/58]), the court would be inclined to include those contributions in an analysis of the totality of their circumstances. The UST argued and Lowman testified that those contributions are understated on Debtors' Schedule I.

As Debtors' counsel argues, however, a conundrum arises in considering voluntary retirement plan contributions as an element of abuse in a Chapter 7 case, because they are usually permitted to continue under Chapter 13. *E.g., In re Phillips*, 417 B.R. 30, 42 (Bankr. S.D. Ohio 2009) ("no logical basis" for including voluntary 401(k) plan contributions in deciding Chapter 7 abuse motion on basis of totality of the circumstances if those funds do not have to be considered in determining the amount to pay under a Chapter 13 plan). The Sixth Circuit reached the latter holding in *In re Davis*, 960 F.3d 346 (6th Cir. 2020). In *Davis,* the Sixth Circuit held that a debtor who had been making regular voluntary 401(k) plan contributions before bankruptcy may exclude the amount of those contributions from calculating the disposable income required to fund an above-median debtor's Chapter 13 plan. The Sixth Circuit cautioned that those contributions might still be part of a Chapter 13 good faith analysis.

In upgrading their living situations from the Rocky Ridge property to the Gibsonburg property, Debtors substantially and voluntarily increased their monthly housing expense. The court is not as critical as the UST of this financial decision, because the Lintons' testimony shows that the Rocky Ridge property was not a safe place to live for the family. The court is convinced that some change in their housing situation was necessary and appropriate. That change was not unfair to their existing creditors. Nor does the court agree with the UST that Debtors' spending rises to the level of recklessness. The home they built does not appear lavish. It is a 2722 square foot frame house with 3 bedrooms, 2½ baths and a finished basement. Nevertheless, Debtors themselves chose that particular path out of the Rocky Ridge property, with new basic housing costs that increased by a factor of almost four.

Overall, the court finds that the record paints a picture of Debtors who are not now needy.

## CONCLUSION

Having reviewed the totality of the circumstances as presented in this case, the court concludes that the UST has met his burden of proof and demonstrated that Debtors are not needy. While one of the factors in the totality of their circumstances analysis strongly favors denial of the motion, the others do not. The balance of the totality of circumstances proven by the UST shows that granting Debtors relief in this case would be an abuse of the provisions of Chapter 7.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtors are allowed thirty (45) days to file a motion to convert this case to a Chapter 13, absent which, the UST's Motion to Dismiss [Doc. # 17] will be granted, and this case will be dismissed, by separate order of the court.

# # #

---

Perhaps conceding Lowman's testimony that the monthly 401(k) contributions are understated on Debtors' Schedule I, Debtors' counsel argued that the court should extend *Davis* to Chapter 7 cases and not consider them at all in the context of a below-median income debtor's overall financial circumstances.

The court would be disinclined to extend *Davis* beyond Chapter 13 plan confirmation issues to Chapter 7 abuse motions. But the court does not need to decide that issue here. Nor does it need to decide the factual issue of precisely what those contributions were and whether they are under-stated on Schedule I. That is because, regardless of the voluntary 401(k) contribution amounts, the court finds that Debtors can meaningfully fund a Chapter 13 plan. The more difficult issues in this case should it be voluntarily converted to Chapter 13 will be how those funds will be distributed among what creditors. There are too many unknowns in that regard—such as what creditors file what kind of claims and how any Croghan Colonial Bank claim will be addressed—to construct a "hypothetical" Chapter 13 plan in this case. Nor does the court need to do so to decide the motion. Suffice to say that it is fair to consider in evaluating Debtors' overall neediness that they have the ability to fund plan payments out of future disposable income and still make 401(k) plan contributions should they choose to do so.